**WRIT NO. W91-22107-Q(A)**

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE 204th JUDICIAL** |
| | § | **DISTRICT COURT** |
| **JAMES BERKELEY HARBIN II** | § | **DALLAS COUNTY, TEXAS** |

**STATE'S OBJECTIONS TO TRIAL COURT'S
FINDINGS OF FACT, CONCLUSIONS OF LAW AND
RECOMMENDATION OF TRIAL COURT ON
APPLICATION FOR WRIT OF HABEAS CORPUS**

Comes now the State of Texas and makes the following objections to the Court's findings of fact and conclusions of law, which were signed by the Court on December 16, 2014:

**I.**

**SUMMARY**

Applicant filed the instant habeas application raising the following grounds for relief: (1) ineffective assistance of counsel at trial; and (2) *Brady* violation. Over the course of nearly a year, multiple hearings were conducted regarding Applicant's claims. On October 31, 2014, Applicant filed proposed findings of fact and conclusions of law. The State filed proposed findings on December 10, 2014. (*See* Exhibit A). On December 16, 2014, the Court entered findings

1

rejecting the State's laches argument and recommending that relief be granted on all of Applicant's claims.[1]

The State objects to the Court's findings of fact and conclusions of law. The Court's findings are not supported by the record. Indeed, many of the findings are based on pure speculation and are not supported by any evidence.

## II.

## HISTORY OF THE CASE

Applicant pleaded not guilty to the murder of his father, James Harbin, Sr. The jury found Applicant guilty and, on April 29, 1991, sentenced him to confinement for life in the Institutional Division of the Texas Department of Criminal Justice. Applicant's conviction was affirmed by the Fifth District Court of Appeals on August 6, 1992. *See Harbin v. State*, No. 05-91-00621-CR (Tex. App.—Dallas August 6, 1992) (not designated for publication).

On June 24, 2010, more than nineteen years since the date of Applicant's conviction, Applicant filed his initial application for writ of habeas corpus. Applicant subsequently filed four amended responses. The Court conducted evidentiary hearings on February 21, 2014, May 9, 2014, May 29-30, 2014, August 22, 2014, and August 28, 2014. Applicant presented testimony from the following witnesses: Dr. Randy Price, Matt Fry, Gary Smart, David Dunlevy, Paula Collins,

---

[1] The State will refer to the Court's December 16, 2014 Findings of Fact and Conclusions of Law as "FOFCOL."

Candace Harbin, George Cole, Ginger Cole, and Julie Badii. The State presented the testimony of Teresa Harry. The Court issued its ruling on December 16, 2014.[2]

## III.

## THE STATE'S 12/10/14 PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On December 10, 2014, the State filed Proposed Findings of Fact and Conclusions of Law. In this pleading, the State set forth the facts and argument supporting its position that Applicant's claims are barred by the equitable doctrine of laches and that, in any event, Applicant failed to prove that trial counsel rendered ineffective assistance and he failed to prove that the State suppressed evidence at trial. Those findings and conclusions, including any and all exhibits, are hereby incorporated in their entirety by reference and are attached as Exhibit A).

## IV.

## LACHES

The State objects to the Court's findings that laches should not apply in this case. (*See* FOFCOL pp. 20-22). In fact, this is a classic laches case: there are dead witnesses, lost or destroyed records, and degraded memories.

---

[2] The State was not served with a copy of the Court's findings. The State learned of the Court's decision on December 29, 2014 when the undersigned searched the Dallas County District Clerk's online records database to see whether any findings had been issued.

### *Pertinent Facts*

On April 29, 1991 Applicant was sentenced to life in prison for the murder of his father. His conviction was affirmed by the court of appeals on August 6, 1992. His petition for discretionary review was refused by the Court of Criminal Appeals. Mandate issued on March 8, 1993.

On June 24, 2010, more than nineteen years since the date of Applicant's conviction, Applicant filed his initial application for writ of habeas corpus. Applicant alleged that he was unable to file his application before 2010 for the following reasons:

> [A] substantial part of the evidence presented in this writ application was not available to Applicant prior to the Fall of 2008. At that time, the Dallas County District Attorney's Office adopted a policy that allowed attorneys representing persons on Applications for Writ of Habeas Corpus to review the District Attorney's trial files. Much of the evidence submitted in support of this writ application only became available to Applicant after this policy went into effect. Under *Perez*, this constitutes a justifiable reason for Applicant not filing this Application sooner.

(*See* Applicant's Response to State's Laches Argument, p. 2).

### *Argument*

The State objects to the Court's findings that laches should not apply in this case. (*See* FOFCOL pp. 20-22). In *Ex parte Perez*, the Court of Criminal Appeals stated that a court may reject a State's laches argument in the following situations: (1) when the applicant's delay is not unreasonable because it was due to a

justifiable excuse or excusable neglect; (2) when the State would not be materially prejudiced as a result of the delay; or (3) when there are compelling reasons for granting relief, including evidence showing actual innocence or that the applicant is reasonably likely to prevail on the merits of his claims. *See Ex parte Perez*, 398 S.W.3d 206, 218 (Tex. Crim. App. 2013).

*The delay in the filing of Applicant's writ
is unreasonable and unjustified*

The State objects to the Court's implicit finding that Applicant's delay in filing his writ (the District Attorney's 2008 open file policy) is justified. (*See* FOFCOL pp. 20-22). Applicant has raised two grounds for relief on habeas: ineffective assistance and *Brady* violation. Applicant's contention that he received ineffective assistance from trial counsel, Matt Fry, is not based on information discovered pursuant to the open file policy. Applicant's claims regarding Fry revolve around his argument "that defense counsel failed to investigate mitigating evidence and failed to properly and adequately present mitigating evidence to the jury at the sentencing hearing." (FOFCOL p. 4). In support of his claim, Applicant presented testimony and/or affidavits from Dr. Randy Price, his mother (Ginger Cole), two of his sisters (Julie Badii and Candace Harbin), his aunt (Paula Collins), and several friends (Daniel Dunlevy, Kyle Pendleton, Sam Pendleton). He presented a re-print of a 1988 letter from the complainant's psychiatrist, Dr. Daniel Pearson, to the Texas Rehabilitation Commission. (*See* Memorandum in

5

Support of Application for a Writ of Habeas Corpus, Exhibit 2). None of this evidence came from the District Attorney's file.[3] Applicant failed to articulate a legitimate reason for waiting nearly twenty years to complain that Fry was ineffective.

Next, Applicant's claim regarding the open file policy as it pertains to his *Brady* argument is disingenuous. As such, the Court's finding that "Laches does not apply to this case based on the fact that the evidence discovered in the District Attorney's files was not available to Applicant prior to late 2008," is not supported by the record. While it may be true that in 2008 the State began opening its files in post-conviction proceedings, the record does not show that Applicant ever made any attempt to gain access to the State's files prior to the filing of the instant writ in 2010. Indeed, the record does not show that after his conviction became final in 1993 Applicant ever made any attempt to challenge his conviction on any basis until 2010. The fact that Applicant did not make any attempt to challenge his conviction for seventeen years demonstrates a clear lack of diligence in asserting his rights.

---

[3] The State recognizes that a variation of this letter was found in the State's trial file. The State's argument as it relates to this letter is addressed in connection with its arguments regarding Applicant's *Brady* claims.

Applicant failed to show that the delay in the filing of his writ was in any way reasonable. The State objects to any findings to the contrary as they are not supported by the record.

*The State is materially prejudiced*
*by Applicant's delay in filing his writ*

The State objects to the Court's finding that it "rejects any claim that the state has been prejudiced as required for an application of laches." (FOFCOL p. 21). During the habeas proceedings, the State urged two distinct reasons for the application of laches in this case: (1) the delay has prejudiced the State's ability to respond to the allegations contained in the writ and (2) the delay will prejudice the State in its ability to re-try Applicant should relief be granted. Importantly, the Court's findings fail to address the State's first argument. The Court does address the State's second argument, but those findings are not supported by the record.

First, the State is materially prejudiced in its ability to respond to and defend against the allegations contained in Applicant's writ. Applicant contends that trial counsel Matt Fry was ineffective because he failed to investigate and present evidence at punishment regarding the complainant's mental illness. As a threshold matter, because of Applicant's delay, the State is now in the position that it is unable to admit or deny the extent of the complainant's mental illness and whether his mental illness caused him to become violent. None of the complainant's mental health records were admitted at trial. By the time of the evidentiary hearings in

7

2014, his mental health records had been destroyed and were no longer available. (WR5:57, 67-68). His psychiatrist, Dr. Pearson, had passed away. And a doctor who treated him at Willowbrook Hospital, Dr. Ricardo Shack, has no recollection of treating him. (WRR5:67-68).

It is undisputed that the complainant suffered from some form of mental illness. The dispute regarding the complainant's illness concerns the nature and extent of that mental illness. The only available mental health record is a 1991 re-print of a 1988 report written to the Texas Rehabilitation Commission, summarizing the complainant's mental health. (DX#11). This letter does not identify the complainant's specific diagnosis. It merely identifies a series of symptoms exhibited by the complainant. Given the lack of medical records or medical testimony, any finding by the Court regarding the complainant's diagnoses or that the complainant's mental illness rendered him violent is without basis in the record and is purely speculative.

Had Applicant challenged his conviction closer in time to his conviction, the State may have been able to challenge his allegations with the complainant's medical records and/or testimony from the complainant's treating physicians. Had Applicant challenged his conviction closer in time to his conviction, the State may have had at least the opportunity to present additional family members' testimony

8

regarding the complainant's behavior/temperament in the year and a half preceding his death.

As to Fry's investigation of the complainant's mental illness, the State is again unable to refute Applicant's allegations. At the evidentiary hearing, Fry could not even identify Applicant as his former client, much less describe the minutiae of his representation. (WRR2:12). To make matters worse, Fry testified that he was unable to locate his complete file. (WRR2:13). He was only able to locate a few documents. (WRR2:13-14; DX#2). He had little to no recall of the necessary details regarding Applicant's case. (WRR2:16-17, 19, 20, 21, 22, 23, 27, 28, 29, 33, 34, 36-37, 41). He did not recall every witness contact. (WRR2:19, 28). He did not recall who testified at trial. (WRR2:19-20). This is no small wonder as Applicant had been convicted over 20 years before. Had Applicant challenged his conviction closer in time to his conviction, Fry may have had a better recollection of his representation or he may have been able to locate his complete file.

The State is also hamstrung in its ability to respond to Applicant's *Brady* claim. As stated, Fry's memory had degraded. He did not recall the nature of any pre-trial disclosures made by the prosecution. (WRR5:33). Former prosecutor, Gary Smart, testified at the evidentiary hearing that he recalled some details of Applicant's case, but he did not have a complete recollection of trial or his

9

investigation and preparation of Applicant's case. (WRR3:54-72). He did not recall where he obtained certain documents that were located within his file. (WRR3:62-63). He did not recall what he disclosed to the defense prior to trial. (WRR3:55-56, 62-63). Given Smart's degraded memory and the lack of Fry's complete file – which, might have contained notes regarding the State's disclosures or, at the very least, would have shown what Fry had in his possession – the State is unable to admit or deny Applicant's claim that evidence was suppressed.

Second, the State will suffer material prejudice in the event that Applicant must be retried. The Court's findings recite that "The Court is recommending a new sentencing hearing and the Court finds that the state is fully able to present their evidence and arguments at a new sentencing hearing." (FOFCOL p.21). The Court's finding is not supported by the record. As argued above, the State is unable to prove or disprove the extent of the complainant's mental illness (and whether that illness caused him to be violent) on habeas. It stands to reason that if the State is unable to make this showing on habeas, it is unlikely that it will be able to do so in the event of a new punishment hearing. The extraordinary delay in filing of the instant writ has compromised the reliability of any future trial proceedings.

The State has proven material prejudice. The State objects to any findings to the contrary as they are not supported by the record.

*Applicant is not reasonably likely*
*to prevail on the merits of his claims*

The State objects to the Court's finding that Applicant "is reasonably likely to prevail on the merits [of his claims]." (FOFCOL p. 21). This is not a case involving a claim of actual innocence. It is undisputed that Applicant murdered his father. Applicant is merely seeking a new trial on punishment. The basis for both of his claims for relief revolves around his argument "that the jury had inadequate information at the punishment hearing to understand the reason why he killed his father." (FOFCOL p. 3). A review of the transcript of Applicant's trial, however, shows that the complainant's mental illness was before the jury. The State hereby incorporates the facts and argument set out in the State's Proposed Findings of Fact and Conclusions of Law. (*See* Exhibit A, pp. 10-11, 13-34, 36-44).

Applicant is not reasonably likely to prevail on the merits of his claims. The State objects to any findings to the contrary as they are not supported by the record.

## V.

## INEFFECTIVE ASSISTANCE OF COUNSEL

The State objects to the Court's finding that Fry rendered ineffective assistance. (FOFCOL pp. 12-20). The State hereby incorporates the facts and

11

argument set out in the State's Proposed Findings of Fact and Conclusions of Law. (*See* Exhibit A p. 13-34).

## VI.

## *BRADY* VIOLATION

The State objects to the Court's finding that prosecutor Smart withheld exculpatory or mitigating evidence.     (FOFCOL pp. 6-12).   The State hereby incorporates the facts and argument set out in the State's Proposed Findings of Fact and Conclusions of Law.  (*See* Exhibit A p. 36-44).

## VII.

## CONCLUSION

The State objects to the Court's findings and conclusions and recommendations in this case.  In effect, this Court's ruling allows an applicant to sleep on his rights, thereby allowing the passage of time, the destruction of evidence and the fading of memories.   This Court's ruling allows the applicant to then use to his own advantage that lack of evidence to challenge a conviction that has stood firm for more than two decades.   This Court's ruling wholly fails to consider "how [Applicant's delay in filing his writ] has affected the State, and whether, in light of the delay, it is fair and just to grant him relief."  *Perez*, 398 S.W.3d at 218-19.

The State respectfully requests that this Court review the State's Proposed Findings of Fact and Conclusions of Law as well as the State's objections, reconsider the Court's previous findings, and issue new findings of fact and conclusions of law recommending that relief be denied on the basis of the equitable doctrine of laches or, in the alternative, that relief be denied because Applicant failed to prove trial counsel rendered ineffective assistance and he failed to prove that the State violated *Brady*.

Respectfully submitted,

_____
**Christine Womble**

**Susan Hawk**
**Criminal District Attorney**
Dallas County, Texas

**Christine Womble**
**Assistant District Attorney**
State Bar No. 24035991
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *(fax)*
CWomble@dallascounty.org

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document contains 2,803 words, inclusive of all content.

_____
Christine Womble

13

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing document was served on Applicant's counsel, Gary Udashen, via email on January 14, 2015.

_____
Christine Womble

**EXHIBIT A**
**EXHIBIT A**
**EXHIBIT A**

**WRIT NO. W91-22107-Q(A)**

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE 204th JUDICIAL** |
| | § | **DISTRICT COURT** |
| **JAMES BERKELEY HARBIN II** | § | **DALLAS COUNTY, TEXAS** |

## STATE'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER

On this, the _____ day of _____, 2014, came on to be considered Applicant's Application for Writ of Habeas Corpus, the State's Responses, and both parties' amended and supplemental responses. Having considered these pleadings and the official court records, all exhibits and affidavits offered by both parties, as well as testimony and evidence offered at the evidentiary hearings conducted on February 21, 2014, May 9, 2014, May 29-30, 2014, August 22, 2014, and August 28, 2014, the Court enters the following findings of fact and conclusions of law.

## VIII.

## HISTORY OF THE CASE

Applicant pleaded not guilty to murder. The jury found Applicant guilty and, on April 29, 1991, sentenced him to confinement for life in the Institutional Division of the Texas Department of Criminal Justice. Applicant's conviction was affirmed by the Fifth District Court of Appeals on August 6, 1992. *See Harbin v. State*, No. 05-91-00621-CR (Tex. App.—Dallas August 6, 1992) (not designated

16

for publication).  His petition for discretionary review was refused by the Court of Criminal Appeals.  Mandate issued on March 8, 1993.

On June 24, 2010, more than nineteen years since the date of Applicant's conviction, Applicant filed his initial application for writ of habeas corpus.  The State timely filed its response.  On September 28, 2010, the parties entered into an agreed discovery order and habeas counsel was permitted to review the district attorney's trial file in the instant cause.

Applicant subsequently filed four amended responses.  The State filed a supplemental response on May 28, 2014.

In his Fourth Amended Application for Writ of Habeas Corpus, Applicant raises the following grounds for relief:

1. Ineffective assistance of counsel at trial, and
2. *Brady* violation.

This Court conducted multiple evidentiary hearings in connection with the instant writ.  Over the course of these hearings, Applicant presented testimony from the following witnesses:  Dr. Randy Price, Matt Fry, Gary Smart, David Dunlevy, Paula Collins, Candace Harbin, George Cole, Ginger Cole, and Julie Badii.  The State presented the testimony of Teresa Harry.

## IX.

## GENERAL FINDINGS

1. The Court takes judicial notice of the entire contents of the Court's file in

17

Cause No. F91-22107.

2. The Court takes judicial notice of all three volumes of the reporter's record of the trial, which was conducted in April 1991 in the aforementioned cause number.[4]  Citations to this record will be "RR-."

3. The Court takes judicial notice of the entire contents of the Court's writ file in Cause No. W91-22107-Q(A).

4. This Court takes judicial notice of all eight volumes of the reporter's record of the evidentiary hearings conducted on the instant writ.  Citations to this record will be "WRR-."

## X.

## LACHES

Applicant's claims are barred by the doctrine of laches.  Applicant waited more than nineteen years since his conviction to file the instant Application for Writ of Habeas Corpus.  This nearly twenty-year delay has prejudiced the State's ability to respond to and refute the allegations raised in the writ.   Should this Court grant relief on Applicant's claims, the State would be additionally prejudiced in its ability to retry Applicant.

*Applicable Law*

In *Ex parte Carrio*, the Court of Criminal Appeals described the equitable doctrine of laches as follows:

---

[4] The reporter's record of the trial is not dated except for a notation on the cover that the case came to be heard on April 22, 1991. Page 724 of Volume 3, the date of the jury's verdict on punishment, however, is dated April 29, 1991.  (RR3:724).

18

The doctrine of laches is based upon the maxim that equity aides the vigilant and not those who slumber on their rights. It is defined as neglect to assert right or claim which, taken together with lapse of time and other circumstances causing prejudice to an adverse party operates as a bar in a court of equity. Also, it is the neglect for an unreasonable and unexplained length of time under circumstances permitting diligence, to do what in law, should have been done.

992 S.W.2d 486, 487 n.2 (Tex. Crim. App. 1999) (internal quotations omitted).

Laches should be considered in determining whether to grant relief in a case on habeas. *Id*. at 488; *see also Ex parte Perez*, No. AP-76,800, 2014 Tex. Crim. App. LEXIS 1509, at *7-8 (Tex. Crim. App. Oct. 8, 2014) [hereinafter *Perez II*]. Indeed, the Court has recently stated "that laches should apply as a bar to relief 'when an applicant's unreasonable delay has prejudiced the State, thereby rendering consideration of his claims inequitable.'" *Ex parte Perez*, 398 S.W.3d 206, 219 (Tex. Crim. App. 2013) [hereinafter *Perez I*].

In deciding whether laches applies as a bar to relief in a particular case, a reviewing court should consider the totality of the circumstances. *Perez I*, 398 S.W.3d at 215. Relevant considerations may include: the length of the delay; the reasons for the delay; and the degree and type of prejudice resulting from the delay. *Perez I*, 398 S.W.3d at 217. Significantly, the State is no longer required to make a "particularized showing of prejudice." *Perez II*, 2014 Tex. Crim. App. LEXIS at *7 (citing *Perez I*, 398 S.W.3d at 208, 211–212). The determination of prejudice "permit[s] consideration of anything that places the State in a less

favorable position[.]" *Id.* This may include the State's ability to respond to the allegations in an application or the State's ability to retry a defendant. *See id.* at 215–16. The State may suffer prejudice "as a result in [a] delay in light of the faded memories of witnesses and the lack of available evidence, both of which [will] compromise[] the reliability of any future trial proceedings. *Perez II*, 2014 Tex. Crim. App. LEXIS at \*21-22 (citing *Perez I*.398 S.W.3d at 219).

Importantly, "the extent of the prejudice the State must show bears an inverse relationship to the length of the applicant's delay . . . the longer an applicant delays filing his application, ***and particularly when an applicant delays filing for much more than five years*** after conclusion of direct appeals, the less evidence the State must put forth in order to demonstrate prejudice." *Perez I,* 398 S.W.3d at 217–18 (emphasis added).

An applicant facing the possibility of dismissal on the theory of laches must provide a reasonable or justifiable excuse as to the reason for his delay. *Ex parte Smith*, 444 S.W.3d 661, at 14 (Tex. Crim. App. 2014). He is expected "to, at the very least, make diligent inquiries and take steps to educate himself about the proper procedures for seeking additional review." *Perez II*, 2014 Tex. Crim. App. LEXIS at \*20-21.

The Court of Criminal Appeals has cautioned that laches should be used sparingly, but that it should be used specifically in "applications demonstrating an

20

excessive delay that undermine[] or obstruct[] the principles and virtues the criminal-justice system promotes." *Smith*, 2014 Tex. Crim. App. LEXIS at*14. The Court stated:

> Protracted habeas corpus litigation defers convictions' finality, "undermines confidence in the integrity of our procedures and inevitably delays and impairs the orderly administration of justice." This in turn weakens the criminal law's deterrent and rehabilitative functions. "There must come a time when a criminal conviction is final, when the deterrent effects of certainty and immediacy of punishment outweigh an inmate's right to endlessly litigate an appeal of his conviction.

*Smith*, 2014 Tex. Crim. App. LEXIS at 11-12 (quoting *Ex Parte Steptoe*, 132 S.W.3d 434, 437–38 (Tex. Crim. App. 2004) (Cochran, J., dissenting)).

*Findings of Fact*

1.  Applicant murdered his father, James Berkeley Harbin (hereinafter "the complainant"), on January 8, 1991. Following a trial by jury, he was convicted and sentenced to life in prison on April 29, 1991. His conviction was affirmed by the Fifth District Court of Appeals on August 6, 1992. Mandate issued on March 8, 1993.

2.  Applicant filed the instant Application for Writ of Habeas Corpus on June 24, 2010. He filed multiple amended applications. The first evidentiary hearing took place on February 21, 2014. The final hearing took place on August 28, 2014.

3.  Approximately nineteen years passed between Applicant's conviction and the filing of his application.

4.  Applicant's defense at trial was that he murdered the complainant in self-defense. He alleged that prior to his death, the complainant was mentally ill and violent.

5.  None of the complainant's medical or mental health records were

introduced into evidence at Applicant's trial.

6. Prior to his death, the complainant was treated by psychiatrist Dr. Daniel B. Pearson, Jr.. There is no evidence showing the date that Dr. Pearson last treated the complainant.

7. Dr. Pearson did not testify at Applicant's trial.

8. Dr. Pearson's records regarding the complainant have been destroyed. The specific date of destruction is unknown. The only available medical record is a 1991 re-print of a 1988 report written to the Texas Rehabilitation Commission, summarizing the complainant's mental health. (DX#11).

9. Dr. Pearson's 1991 reprint of his 1988 letter does not identify the complainant's specific diagnosis. It merely identifies a series of symptoms exhibited by the complainant.

10. Dr. Pearson died on January 23, 2013. (SX#4).

11. The complainant was treated by Dr. Ricardo Shack in 1989 at Willowbrook Hospital. (WRR5:57). Willowbrook Hospital no longer in exists. (WRR5:67). Willowbrook Hospital has since destroyed it's records. (WRR5:67). Dr. Shack has since destroyed his own records regarding the complainant. (WRR5:67-68). Dr. Shack has no recollection of treating the complainant. (WRR5:67-68).

12. It is undisputed that the complainant suffered from some form of mental illness. Given the lack of medical records or medical testimony, however, it is impossible to make any specific finding regarding the complainant's diagnoses and the nature or extent of any treatment he may have received. It is also impossible to make any finding that the complainant's mental illness caused the complainant to be violent.

13. Given the lack of medical records and the lack of medical or psychiatric testimony, the State is unable to refute Applicant's claim that the complainant was mentally ill and that the complainant's mental illness rendered him violent.

14. Had Applicant challenged his conviction closer in time to his conviction, the State may have been able to refute his allegations with the

22

complainant's medical records and/or testimony from the complainant's treating physicians. At this late date, the records are unavailable, and the complainant's physicians are either dead or have no memory of the complainant.

15. Because of Applicant's delay in filing his writ, the State is also unable to call witness Hanna Fuller in an effort to refute his claims. The complainant lived with Applicant and his sister, Hanna Fuller, in the year and a half preceding his death. Given the fact that they shared a home, Fuller may have been able to provide testimony as to the complainant's behavior or any interactions she observed between Applicant and the complainant. Hanna Fuller died in 2004. (SX#5).

16. Had Applicant challenged his conviction closer in time to his conviction, the State may have had at least the opportunity to present Fuller's testimony regarding the complainant's behavior/temperament in the year and a half preceding his death.

17. Applicant's delay in challenging his conviction has prejudiced the State's ability to respond to his allegations with relevant and competent evidence.

18. The memories of Applicant's own witnesses have degraded over the past two decades. These witnesses include: Ginger Cole (WRR5:44, 61, 76–77, 89); George Cole (WRR4:45, 60, 64); and, Julie Badii (WRR5:8, 32–34).

19. Applicant was represented at trial by Matt Fry. Fry testified at the February 21, 2014 evidentiary hearing that he was unable to locate his complete file in this case. (WRR2:13). He was, however, able to locate a few documents. (WRR2:13-14; DX#2). Fry has little to no recall of the necessary details regarding Applicant's case. (WRR5:16-17, 19, 20, 21, 22, 23, 27, 28, 29, 33, 34, 36-37, 41). He does not recall the name of every witness he interviewed. (WRR5:19, 28). He does not recall the nature of any pre-trial disclosures made by the prosecution. (WRR5:33).

20. Due to the fact that more than nineteen years has passed since Fry represented Applicant, the fact that Fry no longer has his file, and the fact that Fry's memory has faded, it is impossible to determine what information Fry had in his possession at the time he represented Applicant regarding the instant offense. Without Fry's complete file, it cannot be

23

determined whether Fry had any notes detailing his efforts to investigate this case. Without Fry's complete file, it cannot be determined whether Fry had any notes concerning the nature of the information that the State disclosed during discovery or the date that it was disclosed.

21. Given the state of Fry's file and his lack of recollection of critical details, the State is prejudiced in its ability to refute many of Applicant's allegations regarding Fry's representation and the State's disclosures. Had Applicant filed his writ in a timely fashion, Fry may have been able to locate his file. Fry may have had a better recollection as to his investigation and preparation of Applicant's case. Fry may have had a better recollection of the State's pre-trial disclosures.

22. Applicant's case was prosecuted by former Assistant District Attorney Gary Smart. Smart recalls some details of Applicant's case, but does not have a complete recollection of trial or his investigation and preparation of Applicant's case. He does not recall where he obtained certain documents that were located within his file. He does not recall what he disclosed to the defense prior to trial.

23. Given Smart's lack of recollection of critical details, the State is prejudiced in its ability to refute many of Applicant's allegations regarding Smart's prosecution of Applicant's case. Had Applicant filed his writ in a timely fashion, Smart may have had a better recollection as to the origin of evidence in his file. Smart may have had a better recollection of his pre-trial disclosures to the defense.

24. The lack of critical records, the death of critical witnesses, and the faded memories of existing witnesses has prejudiced the State's ability to respond to the allegations in Applicant's writ.

25. The lack of critical records, the death of critical witnesses, and the faded memories of existing witnesses would prejudice the State in its ability to re-try Applicant, should he be granted relief on the instant writ. Indeed, the delay has compromised the reliability of any future trial proceedings.

26. Applicant waited an extraordinary length of time to file his initial application for writ of habeas corpus.

27. Applicant has failed to present any evidence justifying the nineteen-year delay in the filing of his writ.

28. Any prejudice suffered by Applicant due to the passage of time (absence of records, faded witness memories, etc) is due solely to his own delay in waiting to file his initial application for writ of habeas corpus. As such, Applicant is not entitled to claim that *he* has been prejudiced by the passage of time since it was entirely his choice to delay the filing of the instant writ.

29. The State has proven that laches should apply in this case.

30. Applicant's claims are barred by the equitable doctrine of laches.

*Conclusions of Law*

31. This Court must consider the equitable doctrine of laches. Indeed, the Court of Criminal Appeals has recently decided several cases demonstrating a trend toward greater application of this doctrine.

32. Applicant has been dilatory in filing his Application for Writ of Habeas Corpus.

33. Given the passage of so many years since the date of the offense and Applicant's trial, there is difficulty in ascertaining the facts pertinent to Applicant's grounds for relief. *See Carrio*, 992 S.W.2d at 488.

34. The passage of so much time has prejudiced the State's ability to refute Applicant's allegations.

35. The passage of so much time will prejudice the State in its ability to re-try Applicant should he be granted relief on this writ.

36. Both the State and society have a strong interest in the finality of this conviction, which was affirmed 22 years ago.

37. Consideration of Applicant's claims is barred by the equitable doctrine of laches.

38. The Court recommends that Applicant's writ be **DENIED** on the basis of

the equitable doctrine of laches.

In the alternative, the Court makes the following findings and comes to the following conclusions as to Applicant's specific grounds for relief:

## XI.

## SPECIFIC FINDINGS

*GROUND ONE: INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL*

In his first ground for relief, Applicant contends that Matt Fry rendered ineffective assistance at trial. Specifically, he contends that Fry: (1) failed to present evidence of the complainant's mental state; (2) failed to present evidence of Applicant's mental state; (3) failed to present evidence from a mental health professional regarding the complainant's mental illness; (4) failed to interview or call to testify six young men whom the complainant allegedly threatened or abused; (5) failed to call the complainant's child from a prior marriage to testify regarding the complainant's abuse of his ex-wife; and (5) he failed to present evidence concerning police reports the complainant's ex-wife filed regarding the complainant.

26

*Applicable Law*

*Burden of Proof*

In a post-conviction collateral attack, the burden is on the applicant to allege and prove facts which, if true, entitle him to relief. *Ex parte Maldonado*, 688 S.W.2d 114, 116 (Tex. Crim. App. 1985). The standard of proof is by a preponderance of the evidence. *See Ex parte Adams*, 768 S.W.2d 281, 287-88 (Tex. Crim. App. 1989).

*Effective Assistance of Counsel*

The right to effective assistance of counsel is guaranteed under both the federal and state Constitutions. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. To succeed on a claim of ineffective assistance of counsel, an applicant must show that: (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984); *see also Hernandez v. State*, 726 S.W.2d 53, 56-57 (Tex. Crim. App. 1986) (applying *Strickland* to cases arising under article I, section 10 of the Texas Constitution). A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome. *Id*. at 694; *see also Miniel v. State*, 831 S.W.2d 310, 323 (Tex. Crim. App. 1992).

Counsel's competence is presumed, and an applicant must rebut this presumption by proving by a preponderance of the evidence that his attorney's representation fell below the standard of prevailing professional norms and that the challenged action was not sound strategy. *See Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986); *see also McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996). He must rebut the presumption with evidence, not allegations. *See Roberson v. State*, 852 S.W.2d 508, 510 (Tex. Crim. App. 1993). It is not enough for him to show that the errors had some conceivable effect on the outcome of the proceedings. *Strickland*, 466 U.S. at 693. He must overcome the presumption that, under the circumstances at trial, the challenged action could be considered sound trial strategy. *Strickland*, 466 U.S. at 689. Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. *Strickland*, 466 U.S. at 700; *McFarland*, 928 S.W.2d at 500.

***Findings of Fact***

*The Complainant's Mental State*

1. The jury was well aware that the complainant suffered from mental illness and that, at times, he exhibited threatening and violent behavior.

2. During the guilt/innocence phase of trial, Fry cross-examined State's witness Sam Gish regarding the complainant's mental illness. Fry asked Sam Gish if he was aware that the complainant had "mental problems[.]" (RR1:29). Gish testified that he "[had] heard that." (RR1:29).

28

3. In his opening statement during the guilt/innocence phase of trial, Fry informed the jury that the complainant had mental illness:

> I want to tell you that the picture that will be drawn is a very tragic one, a very sad one, is a picture of a family made up of good people who were completely undone and destroyed as a family due to the mental illness of the father of the family. *We will show you a picture of a man who was a good man and who developed paranoid schizophrenia, a psychotic disease of the mind, a mental illness, which resulted in him being hospitalized, resulted in him undergoing electroshock therapy, it resulted in him being medicated with drugs and costed [sic] him his self-control, costed [sic] him his self-respect, costed [sic] him his job, costed [sic] him his wife, costed [sic] him his family, and in general, destroyed all of the highest hopes and aspirations of the Harbin family.*
>
> We intend to show you that his mental illness resulted in him having a very paranoid and suspicious mind at times, having very little lack of control about what he would say to others, resulted in him at times being in a rage, resulted at times in him making threats to people's face or behind their back that he would take care of them or kill them, resulted at times in him being physically assaultive to various people, reduced him to the point where he could not work, was discharged from his employment of many years, and in fact, at one point at low ebb, was parking on a parking lot and staying in his car.
>
> (RR1:302–303) (emphasis added).

4. Fry presented the following witnesses during the guilt/innocence phase of trial: Applicant, Ginger Cole, Gary Bronson, Candace Conrad, Teresa Swanner, Candace Harbin, and Karen Neal. Each of Applicant's witnesses testified regarding the complainant's mental illness and/or the complainant's propensity for threatening or violent behavior.

5. Ginger Cole, Applicant's mother, testified at length regarding the complainant's mental health treatment:

> [Ginger Cole]: . . . He developed—at that time, he sought professional counseling. He became real depressed and had some emotional problems and he started seeing a psychiatrist and ended up having

29

electroshock therapy in about 1975. . . .

(RR2:309)

[Ginger Cole]: (In response to a question about how long complainant held a position with the Postal Service) Until he got medical disability from the post office. I believe that was in 1985 or '86.
[Fry]: Now, why did he get a medical disability?
[Ginger Cole]: He had been diagnosed—he had been undergoing psychiatric treatment from a Dr. Daniel B. Pearson in Dallas for several years and apparently the medication didn't help and he became dysfunctional. He got his medical retirement and he hadn't worked for about two or three years before the divorce.
[Fry]: Do I understand then that Dr. Daniel Pearson is a psychiatrist?
[Ginger Cole]: Yes, sir.
[Fry]: And his mental problems continued to worsen, I take it?
[Ginger Cole]: Yes
[Fry]: And he became where he was unable to go to work at all; is that correct?
[Ginger Cole]: That is correct. He got a medical disability or retirement or however you want to categorize it. But it was from the post office and it was due to his mental condition.

(RR2:310).

6.   Ginger Cole testified regarding the complainant's attitude and behavior:

[Fry]: How did this mental illness make him act?
[Ginger Cole]: Mostly he was depressed. He laid on the couch or laid in the bed. It got to the point where I would have to make him get off of the bed so I could change the sheets. He was pretty well dysfunctional . . . .

(RR2:312)

[Fry]: Okay. Did he have occasions where he had very little self-control when something stressful would come up?
[Ginger Cole]: *He was very hot tempered and most of the time I deferred to him and only one time did he get physical with me*.
[Fry]: What was that over?

30

[Ginger Cole]: I don't even remember what it was over. It was probably over something stupid. I had determined that I was going to stand my ground one time and get my way and he threw me up against the wall and I can remember the fear. I mean I have never been treated like that and I just deferred to him ever since. And that feeling is the feeling that I remembered thinking if there had been a gun lying on the table, I would have picked it up and shot him. It scared me to think . . .

[Fry]: *Had you ever felt like that before?*

[Ginger Cole]: *Never since—never before and never since.* I have never had that same fear that same—I mean it was a shock. . . .

[Fry]: How did his relationship with the children go during this period?

[Ginger Cole]: He could be the best father that anybody could ever wish for. He could be very gentle. He would help the children with their lessons and he could explain things to the children in a way that I could not. He could be perfect teacher, and when he wanted to be, he could be a model father as far as, you know, explaining what is right and what is not right. . . .

. . . .

. . . .

. . . .

[Fry]: Was there any open conflicts between he and the children during this period?

[Ginger Cole]: No, not—there was not a specific instance because he was not a very strict disciplinarian. He would pretty much let the kids have their way. . . .

(RR2:313–14)

[Fry]: Why did you make the children aware of those threats?

[Ginger Cole]: Because I wanted them to understand that even though their daddy was their daddy and they loved their daddy, *that he had a violent nature and that they needed to be careful not to aggravate him.*

(RR2:323-24)

[Ginger Cole]: . . . I think that [Applicant] had a fear of developing a mental illness and he didn't want to acknowledge it.

31

[Fry]: Now, his father was a paranoid schizophrenic, true?
[Ginger Cole]: That is true.

(RR2:328).

7. Ginger Cole testified that the complainant's family had a family history of depression. (RR2:328-29).

8. Ginger Cole never engaged in conversations with the complainant's physicians. (WRR5:76–80; RR2:341).

9. On cross-examination, Ginger Cole admitted that the complainant "never physically beat the children." (RR2:341-42).

10. Ginger Cole testified that the complainant threatened her life on several occasions. (RR2:319–23).

11. Applicant testified that the complainant was "like really depressed from being mentally ill." (RR2:355). He testified that the complainant took medication prescribed by his psychiatrist. (RR2:355). He testified that the complainant had electroshock therapy and had been hospitalized at Willowbrook. (RR2:355-56).

12. Applicant testified that the complainant was irritable and volatile. (RR2:356-57).

13. Applicant testified that the complainant would get upset and threaten to harm Applicant's step-father, George Cole. (RR2:359). "He said he would kill him, and other times he said he would castrate him." (RR2:359).

14. Candace Harbin, Applicant's sister and the complainant's daughter, testified to the complainant's mental state and ongoing depression. (RR2:481).

15. Candace Harbin testified to the complainant's propensity for violence. (RR2:481). The complainant threatened her. (RR2:481). The complainant was known to threaten others. (RR2:481, 483).

16. George Bronson testified to the complainant's making threats and to his propensity for aggression. (RR2:457–60). Bronson also testified that he

32

saw the complainant once or twice a week for three years and had only seen the complainant in "a complete rage" on three occasions. (RR2:461-62).

17. Bronson testified that the complainant had severe mental problems. (RR2:457).

18. Candace Conrad testified that the complainant told her to tell Ginger Cole "that he was going to kill her husband [George Cole]." (RR2:470). Conrad never saw the complainant physically abuse anyone. (RR2:473).

19. Teresa Swanner testified about the complainant's outburst at the church, when he threatened to kill George Cole. (RR2:478). Swanner also testified that when the complainant threatened to kill George Cole, he said that "George had put a bruise on Candace [Harbin]." (RR2:478).

20. During his closing, Fry argued that the complainant was mentally ill and that he was violent and abusive. (RR3:619–21, 624-25). Fry argued that Applicant "killed a man who at that time had not a wit in his head and no self-control and was a danger." (RR3:625).

21. During the punishment phase of trial, Fry called the following witnesses: Ginger Cole, Candace Harbin, Ray Anderson, and Linda Strackbein.

22. Ginger Cole testified that Applicant had never before been to prison or on felony probation. (RR3:654). She testified in support of Applicant being placed on probation. (RR3:655-63).

23. Candace Harbin testified in support of Applicant being placed on probation. (RR3:679).

24. At the evidentiary hearing on the instant writ, Fry described his perspective regarding the issue of the complainant's mental illness:

> [Fry]: Looking back on it, I think that - - I just don't remember there ever being any controversy whatsoever about the fact that the father had had a mental illness, that he had been under psychiatric care, that he had lost his career and was unable to work, and had had substantial difficulties in family life and so on because of his mental illness. I think that was - - my memory of it, that was abundantly clear from the

33

people that knew best and had been present with him, living with him, and knew the facts about how his mental illness impacted his life and his behavior and so forth.

[Defense Counsel]: And so are you saying that you didn't feel like it was necessary to give psychiatric testimony about that?

[Fry]: Well, I think that's probably a fair - - a fair summary. I just don't believe that - - or I don't remember any controversy at all about - - about him being mentally ill - - having a mental illness and being treated for mental illness and all these other kinds of things we talked about. In fact, I think the State could not dispute that.

[Defense Counsel]: And - -

[Fry]: It was a fact.

(WRR2:25).

25. At the evidentiary hearing on the instant writ, Ginger Cole conceded that she never knew or received a definitive diagnosis regarding the complainant's mental illness. (WRR5:79–80). She testified that she was "just going by what the doctor said. I'm not a doctor. The doctor's report says that he's - - was severely depressed, which I observed. I observed these manic highs and lows[.]" (WRR5:43). The trial court asked how the complainant would behave when he was manic. (WRR5:43). Ginger Cole testified that "He would be up, doing things or - - well, like, it's hard to remember 30 years ago." (WRR5:43). She observed that the complainant "was very capable of turning on Mr. Nice Guy when he wanted to and being totally out of control when he didn't want to be[.]" (WRR5:43).

26. Ginger Cole conceded that she never informed the family court judge about the complainant's abusive behavior during child custody hearings. (WRR5:48).

27. Ginger Cole is not a credible witness.

28. According to Smart's notes, Ginger Cole informed Teresa Harry that she feared the Applicant more than she feared the complainant. (DX#6 p.1 (Gary Smart's handwritten notes).

29. At the writ hearing, George Cole testified that he is Applicant's step-father. George Cole's testimony regarding the complainant's threatening behavior is largely hearsay from Ginger Cole. (WRR4:44–48, 60).

34

30. At the writ hearing, Paula Collins, Applicant's maternal aunt, testified that on one occasion, she woke up in the middle of the night and saw the complainant sitting on her bed. (WRR3:110). She felt scared because she "didn't know what he was doing in my bedroom in the dark." (WRR3:110). He got up to leave and jerked her head to kiss her. (WRR3:113-14). When he jerked her head he caused her neck problems that she then suffered for years. (WRR3:114, 125, 126). Collins never informed anyone about the incidents. (WRR3:126–27). Collins testified to complainant's stalking behavior of Ginger Cole. (WRR3:117).

31. Contrary to Applicant's contentions, Fry cross-examined witnesses and presented evidence showing that that the complainant suffered from mental illness and exhibited threatening behavior.

32. Applicant has failed to prove the complainant's mental illness to any degree of specificity greater than that already presented at Applicant's trial.

33. Applicant has failed to prove that the complainant's mental illness caused him to be violent. As such, he has failed to prove that Fry was ineffective in failing to prove that the complainant's mental illness caused him to be violent.

*Applicant's Mental State*

34. The jury was aware that the complainant and Applicant had a volatile relationship. The jury was aware of Applicant's claims that the complainant abused him and that he was scared of the complainant.

35. During the guilt/innocence phase of trial, Sam Gish testified that Applicant never told him that the complainant abused him. (RR1:45). Gish never saw bruises on Applicant. (RR1:45-46).

36. Gish testified that two days before the instant murder, Applicant "told me he wanted to kill his dad and asked me if I would help." (RR1: 24). Applicant told Gish that he hated the complainant. (RR1: 27). He planned to hide the complainant's body "in a well-hidden spot." (RR1: 27). "He said he was going to park [the complainant's car] somewhere where it would look like his dad had abandoned it." (RR1: 28).

35

37. Gish testified that Applicant had a gun. (RR1: 24, 27). It was a .380. (RR1: 24).

38. During guilt/innocence, Clayt Spitzer testified that he thought that Applicant "might have said something about [the complainant abusing him] once, but it wasn't a big thing. He just kind of said something about it and then we talked about something else." (RR1: 57). In late December 1990, Applicant called Spitzer while Spitzer was at his girlfriend Kellye Morris's house and asked him if he wanted to help him kill someone. (RR1: 58-59).

39. During guilt/innocence, Matt Tobin testified that he never saw any confrontations between the complainant and Applicant. (RR1:68).

40. During guilt/innocence, Jason Gish testified that he was not aware of the complainant abusing Applicant. (RR1:165).

41. In his opening statement during the guilt/innocence, Fry addressed issues of abuse and physical intimidation. He stated:

> We will show you a picture of his son who although he desperately wanted the love and acceptance and approval of his father, found that unattainable, felt branded as a failure in his father's eyes, was ridiculed and rejected, was verbally and physically threatened, and came to desperately fear his father, and at times being extremely angry with his father and resentful of him, and that these events continued to heat up over time with no practical resolution to these conflicts seemingly being available until the night in question in which this shooting took place.
> . . . .
> That James, in fear of his own life after his father's rage, went and got his pistol out of the car. That his father came toward him in a rage, abusing him verbally and apparently fixing to grab him. That James, Sr. is a much larger man than James, the son. That the defendant got his gun and he did so to defend himself from his father who he thought at that time would kill him that he blindly and instinctively, in reaction to these threats of his father, as he put it in his statement, fired the gun as quick as he could, and this resulted in the death of Mr. Harbin.

(RR1:303–04).

42. Fry called several family members and other lay witnesses to testify to abuse that Applicant may have sustained by complainant.

43. During guilt/innocence, Applicant testified that the complainant threatened to kill him on four occasions. (RR2:364-65, 366, 367, 369). He testified about physical confrontations with the complainant. (RR2:356–57, 362, 364, 367, 369). He gave inconsistent testimony with regard to his reaction to the complainant's aggression, sometimes testifying to mutual combat and sometimes testifying that he always retreated. (RR2:366–72). Applicant admitted that he would occasionally provoke the complainant. (RR2:492–93).

44. Applicant testified that the complainant verbally abused him. (RR2:357–58, 364). He testified that the complainant would "yell at me a lot." (RR2:356). He testified that the complainant verbally abused others. (RR2:359).

45. Applicant testified that he was intimidated by the complainant and that he was in fear of the complainant. (RR2:361–63, 370–71).

46. Applicant testified that the complainant would leave without telling anyone where he was going or when he would return. "Some of the time I didn't even know where he was. He would take off without telling anyone and he would be gone for like a week or so. (RR2:370-71).

47. With regard to the offense itself, Applicant testified that he shot the complainant in self-defense. (RR3:388–97, 451–454). He testified that the complainant "started coming at me." (RR2: 389). He got his gun from his car. (RR2:392). He testified that at that point, the complainant, "He came at me." (RR2:393). "He was running like he was just coming at me." (RR2:393). Applicant testified that he shot the complainant as the complainant was coming toward him. (RR2:394-95). He claimed that he "was afraid of him hurting me and I did not want to be hurt." (RR2:396).

48. Candace Harbin testified that she witnessed one incident of complainant physically abusing Applicant. (RR2:487). Candace Harbin was informed by Applicant of a limited amount of incidences of physical abuse. (RR2:491). One particular provocation was because Applicant had failed

37

to protect Candace from his friend:

> [Candace Harbin]: Yeah. There was one other time when he told me—when we lived on Audra Street, James had this friend whose name was Chris Lyons. I was in the shower stark naked and he came and picked the lock on my bathroom so he could see me naked. I grabbed the show curtain and had the shower curtain around me and he chased me around the house.
>
> [The complainant] was very upset that [Applicant] was in the house and did not take Chris out of the house and make him leave or something. He told me that he should have killed my brother for what he did. He didn't say, "I will kill him." He said, "I should kill him for not protecting you."

> (RR2:492-93). This was the only threat towards Applicant that the complainant made to Candace. (RR2:493-94).

49. Candace testified that the relationship between Applicant and the complainant was not always hostile. (RR2:488)

50. Karen Neal, Applicant's ex-girlfriend, testified that she saw bruises and other marks on Applicant's body. (RR3:597).

51. During the guilt/innocence phase, Hannah Fuller testified for the State. Fuller testified that she only witnessed two arguments between Applicant and the complainant. (RR3:509). She never saw any physical confrontations. (RR3:509). Fuller testified that had not seen any wounds or indications of abuse on Applicant. (RR3:509). She never heard the complainant threaten Applicant. (RR2:510).

52. During punishment, Fry argued to the jury that the abuse Applicant sustained from the complainant was mitigating. (RR3:710).

53. At the evidentiary hearing on the instant writ, former prosecutor Gary Smart testified that he found no indications of chronic abuse during his investigation:

> [Court]: But were there any details as far as abuse or anything like that?

38

[Smart]: No.

[Court]: So you didn't have any idea what made the divorce bitter, whether it was money or abuse or a combination?

[Smart]: I didn't have any indication that there was abuse involved. I think money was an issue and Mr. Harbin, Sr., not working and not maintaining a job and lying around the house a lot and not doing anything to provide for the family or contribute in anything to family that was—and I—I interviewed George Cole. I interviewed Julie Harbin, another sister, on a couple of different occasions because I was trying to determine why—if there was any underlying factors as to why an 18-year-old kid would wake his dad up and shoot him six times in the back.

[Court]: And do you recall thinking that maybe, maybe there was some justification? I mean, is that reflected on any offers of settlement that you made or?

[Smart]: No. No. When—When I was—got this file and looked through the file, that's what I was looking for. I was looking for something to indicate to me as to some type of abuse on the part of—that Mr. Harbin, James Harbin, or some mitigating circumstance that would justify him waking his dad up and—shooting him—

[Court]: Okay.

[Smart]: —other than just psychopathic.

[Court]: Okay. And did you find anything?

[Smart]: I did not.

(WRR3:60–61).

54. Smart's interviews with others turned up no signs of physical abuse:

[Smart]: —No, there wasn't any other signs of aggression and not from any of [Applicant]—I think I interviewed three or four of [Applicant's] friends, as to whether [Applicant], the defendant, had

39

ever complained about abuse he was suffering at the hands of [the complainant]. He—he was verbally abusive toward him. I think he—he belittled it—he belittled the defendant.

[Court]: Okay.

[Smart]: But as far as any physical abuse toward him, there wasn't any indication, other than that one incident that they talked about. I think Candace said he knocked him over the back of the couch or something.

(WRR3:67–68).

55. Had Smart had any evidence of abuse, he would have recommended a more lenient sentence. (WRR3:69–70).

56. Applicant was only interested in a plea bargain for probation and no jail time. (WRR2:39; DX#2:7)

57. At the writ hearing, George Cole, Applicant's step-father, testified that he never witnessed the complainant verbally or physically abuse of Applicant. (WRR4:59). George Cole testified that Applicant never told him that the complainant was abusing him. (WRR4:62).

58. At the writ hearing, Candace Harbin testified that she saw limited instances of abuse by the complainant, physical less so than verbal. (WRR6:27–29).

59. At the writ hearing, Applicant's sister, Julie Badii, testified. Badii did not recall meeting with any lawyer prior to Applicant's trial. (WRR5:8). Badii's testimony regarding the complainant's abuse of Applicant is based on a limited number of instances and hearsay. (WRR5:20–21). Badii did not witness any physical violence towards Ginger Cole or other family members beyond two instances with Applicant. (WRR5:23–24, AX 1E:2).

60. At the writ hearing, Badii testified that she witnessed the incident when the complainant backhanded Applicant in the kitchen. (WRR5:12). On another occasion, after the divorce, she saw Applicant and the complainant fight. (WRR5:14). She described the incident as follows:

This is after my parents were divorced and my brother was living with

40

- - with my aunt, and my dad was not present very often. I didn't see my brother very much, so he came and picked up my friend and I, and we went to visit my brother at my aunt's house. And he had taken us out to get Whataburger and we went in his room and were eating. And my dad came in in a rage and opened up his bed - - - opened up my brother's bedroom door and just started yelling at him. And they went in the kitchen and, of course, I - - I don't recall what they were arguing about but it piqued my interest, so I followed them into the kitchen and I could hear them arguing and yelling. And my - - they took swings at each other. And my dad picked him up by his throat. And I was so scared, I started screaming and yelling. I had never seen him do anything like that before.

(WRR5:14).

61. According to Smart's notes, Julie Badii's only knowledge of any abuse stemmed from hearsay. (AX 6:7). Badii informed Smart she never witnessed violence towards Applicant. (AX 6:7 ~4-9-91 4:30).

""T/C to Julie Harbin. She saw her dad on weekends. She got along with [the complainant]. She never saw [the complainant] hit [Applicant]. She said [the complainant] did not hit her. She has heard from Karen Neel that [the complainant] was abusive toward [Applicant]"

Badii reiterated this testimony in a second visit with Smart. (DX 6:8).

62. At the writ hearing, Applicant's friend, David Dunlevy, testified that he witnessed the complainant physically attack Applicant. (WRR3:79–83). By Dunlevy's own account, however, at the time the incident began, he "was still sort of in a dream state[.]" (RR3:90). Dunlevy never informed anyone of the incident he observed. (WRR3:92–93). Dunlevy claims that he told his mother sometime in the late '90s. (WRR3:95). Dunlevy's statement, however, cannot be corroborated by the State as Dunlevy's mother passed away in 2006. (WRR3:95). Dunlevy did not contact any authorities despite Applicant being attacked nor did Dunlevy attempt to seek treatment for Applicant after the attack. (WRR3:92). Dunlevy's testimony is extremely fragmentary as to what he observed. (WRR3:79, 89–91). Dunlevy testifies to witnessing a big fight break out but also testifies he somehow fell asleep during it only to be awoken later by

41

Applicant during the fight. (WRR3:79, 89–91). Dunlevy later testified the fight broke out in another room. (WRR3:91). Dunlevy claims that Applicant was at the mercy of the complainant, who was choking Applicant, but fails to account how Applicant could navigate to Dunlevy's bedroom and shake Dunlevy to wake him up. (WRR3:92).

63. Dunlevy testified that Fry did not contact him prior to trial. (WRR3:87).

64. The fact that the complainant and Applicant had a volatile relationship was before the jury at applicant's trial. The jury heard from Applicant and his sister about specific episodes of abuse. The only episode of abuse presented at the writ hearing, which was not presented at trial was that recounted by Dunlevy. As argued above, Dunlevy's account is suspect.

65. Applicant has failed to present credible evidence of abuse beyond that already presented at trial. As such, he has failed to prove that Fry was ineffective in failing to present evidence of Applicant's mental state or the complainant's abuse of Applicant.

*Mental Health Professional*

66. At trial, Smart objected to the introduction of hearsay evidence regarding the complainant's mental illness. (RR1:30).

67. Fry did not present evidence of the complainant's mental illness through a mental health professional.

68. Apparently, the concept of battered woman syndrome was mentioned during voir dire and Fry briefly reiterated it during his punishment phase closing argument:

> [Fry]: . . . A tremendously wide range of punishment has been provided for you and we all went through such a long involved process in voir dire trying to show you it is there and to show you [that] you can't ever tell what a particular case of murder is "worth" in terms of a sentence until you have looked at the facts because they are all different. There are all kinds of different circumstances and there are all kinds of different people involved. ***We went through so much conversation about a battered woman syndrome and all of the problems they might have. The Judge went through that with you***

42

*and related many other types of mitigating circumstances that you could see in murder cases, and I earnestly tell you that his case has got so many parallels between that kind of situation.*

(RR3:707).

69. Dr. Daniel B. Pearson, Jr. treated decedent for decedent's mental health. Dr. Pearson wrote a 1988 report summarizing decedent's mental health. (WRR5:65). Dr. Pearson's report was reprinted in 1991. (WRR5:63). Dr. Pearson was not called to testify at trial. Dr. Pearson passed away January 23, 2013. (*See* State's Exhibit #4). Dr. Pearson's records have been destroyed. (WRR1:75).

70. Dr. Ricardo Shack treated complainant in 1989 at Willowbrook Hospital. (WWR5:57). Willowbrook Hospital no longer exists. (WRR5:67). Willowbrook Hospital has destroyed its records. (WRR5:67). Dr. Ricardo Shack has destroyed his records concerning the complainant (WRR5:67–68). Dr. Ricardo Shack has no recollection of treating the complainant. (WRR5:67–68).

71. At the writ hearing, Fry testified that his strategy at trial, with regard to the complainant's mental illness, was to introduce those persons with the best knowledge of the complainant's activities and illness. (*See* WRR2:24–25).

72. Fry testified that he did not recall whether he spoke with Dr. Pearson or whether he reviewed any of Dr. Pearson's reports. (WRR2:50).

73. At the writ hearing, Smart testified that he believed that the information contained within the complaint's employment file was sufficient and that no medical expert testimony or the complainant's treating doctors were necessary. (WRR3:70–71). The following exchange took place:

[Udashen]: And did you talk to any of the [complainant's] treating physicians?

[Smart]: I don't—I don't—I don't think I called [the doctors]. I think I went basically off of their reports and saw what their reports aid, so there wasn't any reason for me to contact them.

Because there wasn't anything in the reports that indicated any signs

43

that he had aggression. All the records told me was that when [the complainant] went through his manic depressive states that he was incapacitated. I mean, he didn't do nothing, he just laid around and watched TV and hardly ever got up.

(WRR3:70-71).

74. Forensic Psychologist, Dr. Randy Price, interviewed Applicant in connection with the instant writ. Dr. Price testified at the evidentiary hearing on the instant writ.

75. Other than Dr. Pearson's 1991 letter, Dr. Price did not review any of the complainant's medical records and he could not provide a definitive diagnosis regarding the complainant. (WRR3:13). Dr. Price conceded that Dr. Pearson's letter did not state anything about violence. (WRR3:15).

76. Applicant told Dr. Price at the time of the offense, that he and the complainant "physically fought." (WRR3:27-28). Dr. Price formed his opinion based on Applicant's representations as to how the offense transpired. (WRR3:28-29).

77. Applicant's rendition to Dr. Price conflicts with the version that he told his half-sister Teresa Harry in 2010. In 2006, Harry and Applicant participated in the TDCJ Victim/Offender Mediation Program. (WRR3:143-45). After mediation, in 2010, Applicant wrote Harry a letter in which he told her that on the night of the offense, there was no physical confrontation between him and the complainant. (SX#2). He wrote, "The truth is that there was no physical confrontation that night. Everything was verbal." (SX#2). He told Harry that on the night of the offense he shot the complainant because he was angry with him. (WRR3:151; SX#2).

78. Given the version of events Applicant gave Harry, it is at least possible that Dr. Price's opinion, which is based on Applicant's report that there was a physical confrontation at the time of the offense, may be invalid.

79. Dr. Price conceded that expert testimony as to mental illness does not always impact the jury during the punishment stage. (WRR2:74).

80. Although Dr. Price testified that he was available to testify to this opinion in 1991, he also testified that this was his first time, in over thirty years of

44

practice, testifying on the theory of psychological self-defense in the context of an abused child. (WRR3:30). Accordingly, Applicant has failed to prove that a mental health professional was available to testify to psychological self defense as it applies to children *in 1991*.

81. Applicant has failed to prove that Fry was ineffective in failing to call a mental health professional at trial.

*Complainant's Other Alleged Victims*

82. Fry's notes reflect that, prior to trial, Diane Gardner provided him with a list of possible witnesses: Kevin Weable, Wesley Gardner, Levi Glossinger, Matt Tobin, Chris Lyons, and Oscar Hernandez. (AX2:5). Diane Gardner did not provide contact information for anyone on the list. (AX2:5).

83. At the evidentiary hearing on the instant writ, Fry testified that he cannot recall whether he contacted anyone on the list. (WRR2:19–20, 30).

84. Of the six listed individuals, two were called to testify at trial as witnesses for the State: Glossinger and Tobin. Glossinger testified he only saw one verbal altercation between the complainant and Applicant. (RR3:539). Tobin testified he that he did not notice any confrontations between the complainant and Applicant. (RR1:64). He did not notice any bruises on Applicant. (RR1:64).

85. Fry did not call Kevin Weable, Chris Lyons, Oscar Hernandez, or Wesley Gardner to testify at trial.

86. In connection with the instant writ, Applicant has failed to present any evidence as to the nature of the testimony that Weable, Lyons, Hernandez, or Gardner may have been able to provide. He has failed to present any evidence proving that they were available and willing to testify at Applicant's trial. This Court should not speculate that a particular witness may have had information that would have been persuasive before the jury. This Court should not speculate that these witnesses would have been available and willing to testify at Applicant's trial.

87. Applicant has failed to prove that Fry was ineffective in failing to investigate or present evidence from Weable, Lyons, Hernandez, or

Gardner.

*Teresa Harry*

88. Teresa Harry is the Applicant's half-sister. She was not called as a witness by the State or the defense in either phase of Applicant's trial.

89. At the evidentiary hearing on the instant writ, Harry testified that the complainant and her mother, Sharon Harbin Tobin were married in 1958 or 1959 and were divorced in 1961. (WRR3:134). The complainant married Ginger Cole eleven years later, in 1971. (WRR3:134).

90. After the divorce, Harry continued to have contact with the complainant. (WRR3:135). She "saw him intermittently and on holidays." (WRR3:135). "It was very happy." (WRR3:136). Harry maintained contact with the complainant even after he married Ginger Cole. (WRR3:136-37).

91. Harry testified that, prior to his murder, the complainant admitted to her that he had been verbally and emotionally abusive to his first wife, Harry's mother. (WRR3:139–140, 156). The complainant did not describe what he did. (WRR3:156).

92. Harry testified that she never witnessed the complainant verbally or physically abuse her mother. (WRR3:137–38). Indeed, Harry was only able to corroborate the complainant's statements to a limited extent with her mother. (WRR3:140–41). Harry's mother would not share any detail with Harry about the abuse, but was adamant that no physical abuse ever occurred. (WRR3:141, 155–56, 175). Indeed, Harry's mother told Harry that she never would have let the complainant take Harry anywhere if she ever thought that the complainant was "in any way physically violent." (WRR3:142).

93. Harry testified that she asked other family members about complainant's behavior as testified to and those family members denied the testimony. (WRR3:167).

94. Harry would not have been a favorable witness for Applicant's defense. Harry testified that she had a very good relationship with her father. (WRR3:136–37). The complainant did not abuse Harry verbally or

physically. (WRR3:137). Harry believes that Applicant had no justification for his acts. (WRR3:171). During her testimony in the writ hearing, Harry became very emotional. (WRR3:166). She testified:

> (In response to a question from the trial court as to why she reached out to Applicant to participate in mediation) I wanted to know - - my thoughts had always haunted me about - - I'm sorry - - about what must have been going through my dad's mind when he knew his only son was shooting him, was there a 15-second interval where he said, my God, my son is shooting me. I mean, you wanna know that someone didn't die alone on a dark dirt road, someone that you loved, no matter what people said they did. And so, I wanted to ask my brother why did you do this, and did he suffer?
> (WRR3:168).

95. Harry was involved in family interactions that included complainant and Applicant. (WRR3:135, 139).

96. Harry did not observe the complainant verbally or physically abuse Applicant, Candace or Julie. (WRR3:139). Harry was never told by Applicant or Applicant's other relatives that Applicant was being abused. (WRR3:157–158).

97. Even if Fry had tried to introduce Harry's testimony about what she had been told Smart would have objected on the grounds of relevance and hearsay. (WRR4:27).

*Waxahachie Police Reports*

98. Waxahachie Police received complaints that the complainant threatened Ginger Cole. (WRR5:51–52). Waxahachie Police took no action based on those complaints. (WRR5:52).

99. At trial, Ginger Cole attempted to testify regarding the aforementioned reports, but the trial court sustained Smart's objection that her testimony was non-responsive to Fry's questions. (RR2:322).

100. Fry did not introduce the police reports into evidence, but Ginger Cole and Candace Harbin all testified to the complainant's stalking behavior.

101. At the evidentiary hearing on the instant writ, Applicant's step-father, George Cole, testified regarding the police reports. (WRR4:37). The complainant never threatened George or Ginger Cole with a weapon. (WRR4:46, 56). The complainant never committed an act of physical violence against the Coles.

102. At the writ hearing, Julie Badii testified that she never witnessed any threats herself. (WRR5:25–26).

103. The jury was well aware of the tension that existed between the complainant and Ginger Cole after their divorce. The jury was well aware of the complainant's behavior toward Ginger Cole after their divorce.

*Conclusion*

104. After his arrest, Applicant gave a 17-page written confession to police. (RR1: 199-205; SX#3).

105. At trial, Fry argued that Applicant's confession should be suppressed. The Court conducted a lengthy hearing in connection with Fry's efforts to have the confession excluded. (RR1:76-161).

106. Fry called multiple witnesses during both phases of trial to testify to the complainant's mental illness and his violent and threatening behavior.

107. Applicant's arguments concern the punishment phase of trial, such that the evidence should have been presented in an effort to mitigate Applicant's punishment. As shown above, much of the complained-of evidence was presented during guilt/innocence. Notably, in its instructions during the punishment phase, the jury was instructed as follows:

> You are further charged that in fixing the defendant's punishment you may take into consideration all of the evidence submitted to you in the full trial of this case; that is, all of the evidence submitted to you in the trial of the first part of this case wherein you were called upon to determine the guilt or innocence of the defendant, and all of the evidence, if any, admitted before you in the second part of the trial wherein you are called upon to fix the defendant's punishment and you will be bound by the Charges of the Court covering both the first and second parts of this trial in determining what punishment shall be

given to the defendant.

(CR:47).

108. Applicant has not provided any credible or non-duplicative evidence to contravene Fry's trial strategy.

109. Applicant has failed to prove that counsel's representation fell below an objective standard of reasonableness and there is a reasonable probability the results of the proceedings would have been different in the absence of counsel's errors. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984); *Bone v. State*, 77 S.W.3d 828, 834 (Tex. Crim. App. 2002).

110. Applicant received effective assistance of trial counsel.

*Conclusions of Law*

1. The Court concludes that Applicant has failed to prove that Fry's representation fell below an objective standard of reasonableness.

2. Applicant has failed to prove the first prong of *Strickland*.

3. The Court concludes that Applicant has failed to prove that the result of the proceedings would have been different.

4. Applicant has failed to prove the second prong of *Strickland*.

5. The fact that other counsel might have tried the case differently does not show ineffective representation. *Ingham v. State*, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984).

6. Applicant has failed to prove that Fry rendered ineffective assistance.

7. The Court recommends that these grounds for relief be denied.

49

## GROUND TWO: BRADY VIOLATION

In his second ground for relief, Applicant contends that Smart committed a Brady violation. Specifically, he contends that Smart suppressed the following evidence: (1) records of Candace Harbin's medical treatment; (2) a letter from Dr. Pearson regarding the complainant's mental illness; (3) information from Teresa Harry that the complainant was verbally abusive toward his ex-wife, Harry's mother; (4) information from Wesley Gardner that the complainant beat Applicant with a broomstick; (5) information from Matt Tobin that there were rumors at school that the complainant was abusive; and (6) that a report had been filed with the Waxahachie Police Department that the complainant had threatened George and Ginger Cole.

### *Applicable Law*

The State has an affirmative duty to disclose all material, exculpatory evidence to the defense under *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To establish a *Brady* claim, a habeas applicant must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the applicant, and (3) the evidence was material. *United States v. Bagley*, 473 U.S. 667, 682 (1985); *Ex parte Kimes*, 872 S.W.2d 700, 702-03 (Tex. Crim. App. 1993).

Favorable evidence is evidence which, "if disclosed and used effectively, '*may* make the difference between conviction and acquittal;'" it includes

exculpatory and impeachment evidence. *Pena v. State*, 353 S.W.3d 797, 811 (Tex. Crim. App. 2011) (citing *Bagley*, 473 U.S. at 676) (emphasis in original). Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the proceeding would have been different. *See Bagley,* 473 U.S. at 682; *see also Thomas v. State*, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Bagley*, 473 U.S. at 682. Materiality is evaluated by considering the withheld evidence in the context of the entire record and the overall strength of the State's case. *See Thomas*, 841 S.W.2d at 404-05. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-110 (1976).

### *Findings of Fact*

1. At the time of trial, the Dallas County District Attorney's Office did not maintain an open file policy.

*Candace Harbin's Medical Records*

2. At the time of trial, the State was in possession of certain medical records belonging to Applicant's sister, Candace Harbin. (WRR3:67).

3. Candace Harbin's records provide that when she was admitted to the hospital, she told medical personnel that the complainant was threatening and abusive. This information is favorable to Applicant's defense.

51

4. Smart testified that he did not subpoena the complained-of medical records. (WRR3:63). Smart testified that he "didn't get those records on my own. Somebody from the defense gave them to me, whether it was Ginger Cole, whether it was Candace, or whether it was Matt Fry." (WRR3:62).

5. Smart testified that he did not give Fry a copy of Candace's medical records. (WRR3:62). He testified as follows:

> I don't - - I don't know why I would have because to the best of my recollection, if I had gotten them from the family, then I would've made the assumption that they would've given them to him or he may have been the one that gave them to me.

(WRR3:62).

6. Smart recalled reviewing Candace's medical records. (WRR3:62).

7. Smart testified that he spoke with Candace prior to trial. (WRR3:58). Smart described that Candace was "sympathetic to [Applicant]" and "a little bit hostile toward me." (WRR3:59). Candace only told Smart of the "the incident where the [complainant] had hit [Applicant] on one occasion." (WRR3:59).

8. Fry's notes reflect that Ginger Cole delivered some information regarding various parties' mental state to Fry. (WRR5:56, DX2:2).

9. At the evidentiary hearing on the instant writ, Fry testified that he does not recall whether that he received or reviewed the instant records. (WRR2:33). Fry received substantial support from Applicant's family. (WRR2:34). Fry did not recall the conversations that he had with Ginger Cole regarding the complainant's mental illness. (WRR2:34).

10. Applicant has not met his burden of proving by a preponderance of the evidence that the complained-of information was not disclosed to the defense.

11. Moreover, Applicant has failed to prove that Fry did not already have the complained-of records in his possession.

12. Even assuming the records were suppressed, Applicant has failed to prove

52

that that the information was material. Notably, as discussed in detail above, Candace Harbin testified at length during both phases of Applicant's trial and provided details regarding the complainant's threatening and abusive behavior. Thus, the information contained within the medical records was known to the defense and presented at trial.

13. Applicant has failed to prove that disclosure of records containing more of the same information already known to the defense would have changed the outcome of the proceeding.

*Dr. Pearson's Letter*

14. At the time of trial, the State was in possession of a letter written by Dr. Pearson regarding the complainant. This letter is substantially the same as the letter Applicant's Exhibit #11. The letter was located within the complainant's employment records from the United States Postal Service. (*See* DX#3).

15. Smart testified that when he learned that the complainant suffered from depression, that is when he "got the records from the post office." (WRR3:70). "[T]here wasn't anything in the reports that indicated any signs that he had aggression. All the records told me was that when Mr. Harbin went through his manic depressive states that he was incapacitated. I mean, he didn't do nothing, he just laid around and watched TV and hardly ever got up." (WRR3:70).

16. Dr. Pearson's letter describes that the complainant suffers from depression and anxiety and "was somewhat schizoid in personality. He also had a tendency to show some paranoid personality." (DX#3). The letter described that the complainant "had a tendency to be manic depressive in his behavior." (DX#3). "When he would get depressed, he would become very angry, hostile, somewhat withdrawn, and experience loss of energy, loss of drive, and become somewhat obstinant [sic]." (DX#3). There is no information contained within the letter that describes the complainant as violent or abusive.

17. Smart testified that he could not recall ever learning that the complainant suffered from mental illness beyond depression. (WRR3:66-67). He testified as follows:

53

I don't—I don't—I don't think I called [the doctors]. I think I went basically off of their reports and saw what their reports said, so there wasn't any reason for me to contact them.

Because there wasn't anything in the reports that indicated any signs that he had aggression. All the records told me was that when [the deceased] went through his manic depressive states that he was incapacitated. I mean, he didn't do nothing, he just laid around and watched TV and hardly ever got up.

(WRR3:72).

18. At the evidentiary hearing, Fry testified that he did not recall whether he sought out the complainant's postal records or whether he received the documents from any source. (WRR5:27).

19. At the evidentiary hearing, habeas counsel asked whether the complainant's post office retirement records were "the sort of thing you would've shown to [Fry]?" (WRR3:56). Smart testified that he "wouldn't have known why I would've shown him - - shown him these records." (WRR3:56). Notably, defense counsel did not ask him specifically about the letter from Dr. Pearson contained within the postal records.

20. Applicant has failed to prove by a preponderance of the evidence that Dr. Pearson's letter was suppressed.

21. Applicant has failed to prove that Dr. Pearson's letter was favorable.

22. Applicant has failed to prove that Dr. Pearson's letter was material.

23. Because Applicant was aware of the complainant's mental illness, Applicant fails to prove that disclosure of the Dr. Pearson's letter would have changed the outcome of the proceeding.

*Teresa Harry*

24. At the evidentiary hearing on the instant writ, Harry testified that the complainant told her that he was abusive toward his ex-wife, her mother. (WRR3:139-40, 156). Neither the complainant nor Harry's mother gave Harry specific details regarding the abuse. (WRR3:156). As such, Harry

54

had extremely limited information to provide on this subject. (WRR3:155-56).

25. Harry testified that she never saw the complainant abuse her mother. (WRR3:167-68).

26. Harry informed Gary Smart of the deceased's depression and the effects of that depression. (WRR4:13).

27. Harry could not recall whether she told Smart that the complainant verbally abused her mother and she could not recall whether he asked. (WRR3:163, 164).

28. Smart reviewed his notes and testified that he did not recall "anything being mentioned about - - anything between Mr. Harbin, Sr., and his first wife." (WRR4:9). Smart testified that he "didn't get anything from her that indicated that she had ever seen any violent tendencies on his behalf or on behalf of him, even towards his mom - - or towards her mom." (WRR3:13).

29. It is impossible for Smart to suppress information that he is not aware of and does not have in his possession.

30. Further, Applicant has failed to prove that this information was material. The alleged abuse concerns the complainant's ex-wife. He was married in 1958 or 1959 and divorced in 1961. That the complainant may have verbally have abused his ex-wife does not prove that the complainant abused his child nearly thirty years later. Indeed, if Fry had attempted to introduce any evidence on this subject, the trial court would have properly sustained the State's objection and excluded it. As such, this information, if disclosed, would not have changed the outcome of the proceeding.

*Wesley Gardner: the Broomstick Incident*

31. Prior to trial, Gary Smart interviewed Applicant's friend, Wesley Gardner. (WRR4:14–15). Gardner informed Smart that the complainant had beat Applicant with a broomstick. (WRR4:14–15).

32. Smart also interviewed Applicant's friend, Matt Tobin, who informed Smart that Gardner had not been around Applicant for the year and a half

55

preceding the murder. (DX#6:6, 4-8-91:4:10 pm).

33. Smart could not recall whether he informed Fry about Gardner's story, but he thought they had some conversation "about that broomstick." (WRR4:16-17). Smart testified that he did not document every conversation he had with Fry. (WRR4:16–18).

34. Applicant has failed to prove by a preponderance of the evidence that this information was suppressed.

35. Applicant did not present testimony or an affidavit from Wesley Gardner.

36. Applicant has failed to prove that the complained-of information was material. Smart testified that he did not believe that the incident with the broomstick was an incident that Gardner observed. (WRR4:23). As such, it was hearsay. (WRR4:23). Indeed, if Fry had attempted to introduce any evidence on this subject, the trial court would have properly sustained the State's objection and excluded it. As such, this information, if disclosed, would not have changed the outcome of the proceeding.

*Matt Tobin*

37. Matt Tobin told Smart that Applicant had told him that Applicant had gotten in "fights" with the complainant. (DX#6:6). Smart's notes do not specify whether Tobin was describing verbal or physical fights. Smart called Tobin to testify at trial. Tobin testified that he did not witness any confrontations between the complainant and Applicant. (RR1:67–68).

38. Applicant contends that the State failed to disclose the fact that Tobin told Smart that the complainant had gotten into a fight with Applicant and that there were rumors around school that the complainant was abusive.

39. Applicant did not present testimony or an affidavit from Matt Tobin. He did not present evidence of any rumors that the complainant was abusive.

40. Applicant has failed to prove by a preponderance of the evidence that the State suppressed exculpatory evidence.

56

*Waxahachie Police Reports*

41. At the evidentiary hearing, George Cole testified that the complainant would call Ginger Cole and threaten "that he's going to kill her and kill me both if he didn't get his family back." (WRR4:47). After the calls, the Coles would contact the Waxahachie Police Department and report it. (WRR4:46-47).

42. Ginger Cole testified that she told Fry about the police reports prior to trial. (WRR5:58). Ginger Cole attempted to make a statement about the records in court but was stopped by Smart for being non-responsive to Fry's questions. (RR2:322)

43. George Cole informed Smart that Waxahachie Police had police records concerning the complainant. (WRR4:37, 51-52).

44. According to Smart's notes, Steve Collier of the Waxahachie Police Department informed Smart that the Department had police records concerning the threats made by the complaint to Ginger and George Cole. (DX#6:11).

45. Ginger Cole informed Fry of the existence of the police records. (WRR5:57–59).

46. Applicant has failed to prove by a preponderance of the evidence that Smart failed to disclose his knowledge of the reports to Fry.

47. Applicant has failed to prove that this information is material. As previously argued, Ginger Cole attempted to testify about the reports at trial, but Smart objected that she was non-responsive to Fry's question. (RR2:322). Smart's objection was sustained. (RR2:322). As such, the complained-of information would not have changed the outcome of the proceeding.

*Conclusion*

48. Applicant has failed to prove by a preponderance of the evidence that the State suppressed exculpatory evidence.

49. Neither Fry nor Smart has any specific recall as to the nature of any

specific disclosures. The witness' degraded memories do not constitute affirmative evidence of a *Brady* violation.

50. Given the passage of so much time, Smart does not recall what he disclosed to Fry. Smart testified as follows:

    > I can remember him coming in the office and sitting next to my desk and reviewing the file before trial. But exactly what all he looked at, I don't know.

    > (WRR3:56). Smart testified that even if he did not provide a copy of a document, he may have let Fry look at it. (RR3:56).

51. Smart testified that when he was assigned Applicant's case he looked for a motive for the murder. He testified that "when I was - - got this file and looked through the file, that's what I was looking for. I was looking for something to indicate to me as to some type of abuse on the part of - - that Mr. Harbin, James Harbin, or some mitigating circumstance that would justify him waking his dad up and - - shooting him - -[.]" (WRR3:61). He found no evidence of abuse beyond the one incident Candace described when the complaint "knocked [Applicant] over the back of the couch or something." (WRR3:61, 68).

52. If Smart had found mitigating circumstances during his investigation, it "would've significantly affected my offer." (WRR3:69)

53. In any event, Applicant has failed to prove that any of the information allegedly suppressed was material. As discussed in detail above, the jury was well aware of the complainant's mental illness and Applicant's claims of abuse. Applicant has failed to show that admission of this additional evidence would have changed the outcome of the proceeding.

54. Applicant has failed to prove that the State suppressed exculpatory information.

*Conclusions of Law*

1. Applicant has failed to prove that any evidence was suppressed, much less that that evidence was favorable or material.

58

2. The Court recommends that Applicant's second ground for relief be denied.

## OTHER GROUNDS

This Court finds that all grounds for relief not specifically addressed herein are without merit and should be denied.

## CONCLUSION

1. This Court concludes that Applicant has not been denied any rights guaranteed him by the United States Constitution and the Texas Constitution.

2. This Court concludes that Applicant is lawfully restrained.

3. This Court concludes that Applicant's Application for Writ of Habeas Corpus is totally without merit.

4. This Court recommends that relief be **DENIED** on Applicant's habeas application.

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE 204th JUDICIAL** |
| | § | **DISTRICT COURT** |
| **JAMES BERKELEY HARBIN II** | § | **DALLAS COUNTY, TEXAS** |

## <u>ORDER ADOPTING</u><br><u>STATE'S PROPOSED FINDINGS OF FACT</u><br><u>AND CONCLUSIONS OF LAW AND ORDER</u>

The Court hereby adopts and incorporates herein the above proposed findings of fact and conclusions of law submitted by the State in *Ex parte James Berkeley Harbin II*.

The Clerk is hereby **ORDERED** to:

1. Prepare a transcript of all papers in this cause and transmit the Court's Findings and Order, including the judgment, sentence, indictment, docket sheets, and other exhibits and evidentiary matters filed in the trial records of this cause, to the Court of Criminal Appeals as provided by Article 11.07 of the Texas Code of Criminal Procedure.

2. Send a copy of the Findings of Fact and Conclusions of Law, and the Order thereon, to Applicant's counsel and to counsel for the State by depositing the same in the United States mail.

**BY THE FOLLOWING SIGNATURE, THE COURT ADOPT'S THE STATE'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN CAUSE NO. W91-22107-Q(A).**

SIGNED AND ENTERED THIS _____ day of _____, 2014.


_____

Judge Lena Levario
204th Judicial District Court
Dallas County, Texas

Respectfully submitted,

_Christine Womble_
_____

**Craig Watkins**
**Criminal District Attorney**
Dallas County, Texas

**Christine Womble**
**Assistant District Attorney**
State Bar No. 24035991
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *(fax)*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document contains 12,873 words, inclusive of all content.

_Christine Womble_
_____
Christine Womble

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was served on Applicant's counsel, Gary Udashen, via email on December 10, 2014.

_Christine Womble_
_____
Christine Womble